IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ALPHONZA LEONARD PHILLIP    )
THOMAS, III,                )
                            )
            Plaintiff,      )
                            )
v.                          )        1:12CV223
                            )
OFFICER PORCHER, in his individual )
capacity, OFFICER HOPKINS, in his  )
individual capacity, OFFICER       )
SOLOMON, in his individual  )
capacity,                   )
                            )
            Defendants.     )

## MEMORANDUM OPINION AND ORDER

In this case, *pro se* Plaintiff Alphonza Thomas brings
claims under 42 U.S.C. § 1983 related to prison conditions and
an assault that occurred while he was a pretrial detainee at the
Alamance County Detention Center ("ACDC"). Defendants B.
Porcher, K. Hopkins, and M. Solomon, all ACDC officials during
some point in Thomas' detention, have moved for summary judgment
and/or for judgment on the pleadings (Doc. 32), and both parties
have filed other related motions (Docs. 78, 86, 92, 93, 97).
Thomas was advised of his right to respond to Defendants'
dispositive motion (Doc. 43), and has responded (Doc. 67, 82).
For the reasons set out below, Defendants' motion for summary
judgment will be granted, and all other motions will be denied.

## I.    BACKGROUND

At all times relevant, Thomas was a pretrial detainee at

the Alamance County Detention Center ("ACDC") for several months in 2010. Defendant Porcher has been a detention officer at ACDC since 1990 and a sergeant since 2006. Defendant Hopkins has been employed as an ACDC detention officer since March 2007, and Defendant Solomon was an ACDC detention officer during 2010.

Thomas alleges a litany of grievances against the Defendants:

(1) On May 9, 2010, Hopkins exposed him to lice and Licenator, an aerosol pesticide, after a lice-infested inmate, Brandon Smith, was placed in Thomas' cell block at the ACDC. (Compl. at 4-5.)

(2) In October 2010, while Solomon was in charge of surveillance and monitoring in Thomas' cell block, Thomas was assaulted and knocked unconscious. (Id. at 6.) A surveillance camera was allegedly "off rotation" and "focused on a wall." (Id.) A "call box" in the cell block was also not functioning, which frustrated Thomas' attempt to call an officer for help after the assault. (Id.)

(3) The detention center was overcrowded. Thomas had to sleep on the floor five feet away from a toilet, and there was one shower for his unit, which included twenty-three to twenty-seven men. (Id. at 8.)

(4) From August 2 through 9, 2010, he was subjected to

four strip searches.  (Id.)

(5)  He was not given a sufficient amount of soap and was refused more when he requested it.  (Id.)

(6)  No medical screening was conducted on incoming prisoners unless they had emergency medical conditions.  (Id. 9.)

(7)  It was extremely hot in the ACDC and the ventilation was poor.  (Id.)

(8)-(10) The ACDC staff were inadequately trained, pretrial detainees were not allowed face-to-face visits, and the phones in the cell blocks were turned off for periods of time as a means of punishment.  (Id. at 9-10.)

(11) The ACDC grievance system was inadequate.  Thomas did not receive a response to many of his grievances, and inmates did not receive a carbon copy of their filed grievances.  (Id. at 10.)

Thomas has sued Defendants in their individual, but not official, capacities.  (Id. at 1.)[1]  He seeks damages and relief in the form of the installation of electronic checkpoints within the cell blocks every few yards, for call boxes and cameras to be tested at the start of every shift, and for call boxes to be

_____

[1] While Thomas' failure to sue Defendants in their official capacity has implications for some of his allegations, the court dispenses with any such discussion because his claims fail nevertheless.

3

installed in each cell of the jail.

Thomas identifies five grievances he filed with the ACDC regarding the conditions there.  (Id. at 2.)  These grievances were filed September 17, 2010, December 30, 2010, January 19, 2011, February 2, 2011, and August 1, 2011.  (Doc. 34-7.) However, he acknowledges that he did not exhaust his remedies as to the grievances filed on January 19, 2011, and February 2, 2011.  (Doc. 15 at 19.)

## II.  ANALYSIS

### A.  Standard of Review

Defendants have moved for judgment on the pleadings, and, in the alternative, for summary judgment.  (Doc. 32.)  With all parties having completed discovery, and with each side having presented dueling affidavits and other documentary evidence, the court will treat Defendants' motion as one for summary judgment. See Fed. R. Civ. P. 12(d) (stating that where a court contemplates converting a Rule 12(c) motion to a summary judgment motion, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion"); Gay v. Wall, 761 F.2d 175, 177 (4th Cir. 1985) ("[T]he term 'reasonable opportunity' requires that all parties be given 'some indication by the court . . . that it is treating the . . . motion as a motion for summary judgment, with the

4

consequent right in the opposing party to file counter affidavits or pursue reasonable discovery.'" (quoting <u>Johnson v. RAC Corp.</u>, 491 F.2d 510, 513 (4th Cir. 1974)) (internal quotation marks omitted)).

A court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine dispute of material fact remains. Where, as here, the non-moving party has the burden of proof on a claim, the moving party is entitled to summary judgment if it demonstrates that the non-moving party's evidence is insufficient to establish an essential element of his claim. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23, 325 (1986). For the purposes of this motion, the court regards Thomas' statements as true and draws all inferences in his favor. <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). But he must establish more than the "mere existence of a scintilla of evidence" to support his position. <u>Id.</u> at 252. If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." <u>Id.</u> at 249–50. Ultimately, summary judgment is appropriate where the non-movant fails to offer evidence on which a reasonable fact-finder could

find for him.  Id. at 252.

**B.   Thomas' § 1983 Claims**

As a pretrial detainee during the relevant time period, Thomas could not, consistent with due process, be subjected to "punishment."  Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979). However, "not every inconvenience encountered during pretrial detention amounts to 'punishment' in the constitutional sense." Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988).   "To establish that a particular condition or restriction of his confinement is constitutionally impermissible 'punishment,' the pretrial detainee must show either that it was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred."  Id.

Thomas' claims are subject to the administrative exhaustion requirement of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).  This requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002).  Under the PLRA, pretrial detainees count as "prisoners" who must exhaust their administrative remedies before filing claims under § 1983.  See 42 U.S.C. § 1997e(h)

6

("[T]he term 'prisoner' means any person . . . detained in any facility who is accused of . . . violations of criminal law . . . ."). Thomas was therefore required to exhaust his administrative remedies prior to filing this lawsuit.

### 1. Lice allegations

Thomas makes allegations against only Defendant Hopkins with respect to the Licenator incident. Hopkins states by affidavit that on one occasion in 2010 he brought an aerosol can of Licenator into the cell block where Thomas was housed. (Doc. 35 at 2.) He did so because the detention center was experiencing an outbreak of lice. (Id.) Licenator was one of several methods used at the detention center to combat the lice. (Id.) Hopkins was following the orders of his superiors when he brought the can into the cell block. (Id.) He further states that when inmate Brandon Smith was booked into ACDC, Hopkins did not know that the inmate had lice. Hopkins says that it was later brought to his attention when several inmates threatened to assault inmate Smith because he had lice. (Id.) When he learned this, Hopkins personally escorted inmate Smith to the medical unit for treatment. (Id.)

Hopkins further states that he did not "personally spray the Licenator in any portion of" the cell block. (Id. at 3.) Rather, he made it available for inmates to use on their

clothing and bedding, as the instructions on the can allowed. (Id. at 2-3.) Hopkins states that he remembers Thomas taking the can of Licenator from another inmate and spraying himself with the contents from head to toe. (Id. at 3.) Thomas then went to the shower stall and washed the substance off of himself. (Id.) Hopkins also states that the cell block dayroom, where he left the product, is a large open area that is located directly in front of the individual cells. The dayroom is approximately thirty-two feet long and thirty-two feet wide with a sixteen-foot high ceiling. The cells are separated from the dayroom by open-barred doors and not solid doors. (Id.)

Thomas' version of these events set out in his unsworn (but notarized) complaint differs from Hopkins' version. Thomas complains that Hopkins sprayed the Licenator in the cell block area and allowed it to be sprayed by other inmates without relocating the inmates or turning the ventilation system on for a sufficient period of time. He also alleges that Hopkins knew that inmate Smith had lice when he put Smith in Thomas' cell block. (Compl. at 4-5.)

However, in his affidavit (Doc. 68-1) Thomas does not dispute the pertinent portions of Hopkins' affidavit. Specifically, Thomas has not created a genuine dispute of material fact on the issue whether Hopkins intended to punish

him, either expressly or by inference, by use of the Licenator spray or exposure to Smith. Regarding express intent, the uncontroverted evidence is that the intent of Hopkins was to combat or prevent the spread of lice in the detention center following the discovery of an inmate who was infested with lice – a legitimate, nonpunitive governmental objective. Even if Thomas' evidence showed that Hopkins' methods were unwise or even negligent, it fails to show an express intent to punish or produce an inference thereof.

Regarding the intentional exposure to lice, Thomas presents no evidence of Hopkins' intent to contaminate Thomas' cell block, full of inmates, with lice. That Hopkins immediately removed Smith when alerted to his lice contamination and provided the inmates with a means to delouse themselves shows that Thomas' bald conclusions of malice are false, and no reasonable factfinder could find otherwise. This claim will be dismissed.

### 2. Assault of October 23, 2010

There is no dispute that while Thomas was in pretrial detention, another inmate, Raymond Joiner, assaulted him. (Doc. 37-1 at 1–2; Doc. 68-1 at 7–9.) However, the Supreme Court has held that prison officials' negligent failure to protect an inmate from assaults by other prisoners is not actionable, as

"the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials." Davidson v. Cannon, 474 U.S. 344, 348 (1986); see also id. ("Far from abusing governmental power, or employing it as an instrument of oppression, respondent Cannon mistakenly believed that the situation was not particularly serious, and respondent James simply forgot about the note."). Deliberate indifference does not set a low bar:

> [T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences. This is precisely why the Supreme Court has seen fit to stress that deliberate indifference requires "more than ordinary lack of due care for the prisoner's interests or safety." . . . To lower this threshold would thrust federal courts into the daily practices of local police departments.

Grayson v. Peed, 195 F.3d 692, 695-96 (4th Cir. 1999) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)).

To show deliberate indifference, a plaintiff must "introduce evidence suggesting that the prison official had actual knowledge of an excessive risk to the plaintiff's safety." Danser v. Stansberry, No. 13-1828, ___ F.3d ___, 2014 WL 2978541, at *5 (4th Cir. July 3, 2014). In other words, the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v.

Brennan, 511 U.S. 825, 837 (1994).  An officer's failure to alleviate a risk that he should have recognized, but did not, will not give rise to a claim.  Id. at 838.

Thomas has not produced any evidence creating a genuine dispute of fact as to whether a Defendant was deliberately indifferent to Thomas' safety in connection with the assault. There is no evidence that any Defendant was aware of facts indicating a substantial risk of serious harm to Thomas by inmate Joiner, nor is there any evidence that officers knew of a substantial risk of harm to Thomas from the arrangement of cameras or call boxes.  Although Thomas originally suggested, in his unverified complaint, that Officer Solomon had some knowledge that Thomas would be assaulted (Compl. at 6–7), Thomas has provided no evidence of such knowledge.  As to any suggestion that Hopkins may have been involved in the assault, Thomas now says that "I got clues from Hopkins it may have been something of his doing but I guess he was just trying to take credit where it was not due."  (Doc. 68-1 at 9.)  Moreover, Thomas appears to have abandoned this allegation.  In his affidavit, he clarified his argument:

> I am not saying an officer assaulted me.  I am saying
> it seemed that way.  This claim is not about a plot by
> officers, it is about the jail over [the] practice of
> poor to no supervision weather [sic] caused by the
> faulty electric devices or persons.

11

(Id. at 7; see also id. at 9.)[2]  Thomas similarly argues that it
was negligent for Officer Hopkins to have ever placed the can of
Licenator in the cell block because it was later available for
use as a weapon.  (Id. at 8.)

In a similar recent case, the Fourth Circuit held that
"because the record lacks any evidence that [the officer] knew
that [a certain inmate] posed a particular danger to [the
plaintiff], the record as a matter of law fails to show that
[the officer] must have appreciated that his act of leaving [the
plaintiff] and [the other inmate] together in an unsupervised
area created an excessive risk to [the plaintiff's] safety on
that basis."  Danser, 2014 WL 2978541, at *6.

In the present case, there is similarly no evidence of any
knowledge of a specific danger to Thomas if he were left
unsupervised in the dayroom.  To the extent that Thomas contends
in later pleadings that the Alamance County Sheriff Terry
Johnson knew that Raymond Joiner's criminal history included
violent conduct, this is not sufficient evidence that the
Defendants named in this lawsuit knew of a specific danger to

---

[2]  Thomas' response to the motion for summary judgment has a similar
concession:  "You could say that the assault was due to lack of policy
to separate pretrial detainees nonviolent from violent convicts,
however looking at the population data even if you had a block for all
violent convicts you would have to place at least 1 nonviolent
pretrial detainee in that block and vice versa."  (Doc. 67 at 14.)

Thomas or otherwise acted with deliberate indifference to a substantial risk of serious harm. Finally, the cognizable evidence, as admitted by Thomas, shows that, as soon as prison officials became aware that Thomas had been assaulted, they provided medical care to him, which included transporting him to the local hospital. (Doc. 37-1; Compl. at 6.) Therefore, summary judgment is appropriate.

### 3. Overcrowding

A claim of unconstitutional prison conditions due to overcrowding requires a plaintiff to show (1) a serious deprivation of a basic human need and (2) deliberate indifference to prison conditions on the part of prison officials. Williams v. Griffin, 952 F.2d 820, 824 (4th Cir. 1991). Basic human needs are those such as food, warmth, or exercise. Wilson v. Seiter, 501 U.S. 294, 304 (1991).

In Thomas' affidavit, he focuses his overcrowding claim on the fact that he had to sleep on the floor and near a toilet. (Doc. 68-1 at 10.)[3] In response, Defendants note that inmates did sleep on mats in the dayroom, although the parties dispute whether Thomas chose a location under the stairs because it

---

[3] Thomas' affidavit complains about conditions suffered by other inmates. Insofar as Thomas proceeds individually, the court does not consider any others' claim.

provided more privacy.[4]  Defendants also state that the number of individuals at the facility was not in excess of the maximum capacity and that there was space on the dayroom floor for all of the individuals assigned to the cell block.

Considering all claims of the effects of the alleged overcrowding, both separately and cumulatively, Thomas has failed to create a genuine issue of material fact on the question whether Defendants violated his due process rights.  He has not pointed to facts showing the deprivation of a basic human need.  Moreover, his allegations that nameless "high officials are responsible" for the overcrowding fail to show that the named Defendants were responsible for or even aware of the alleged overcrowding.  (Doc. 68-1 at 9.)

### 4.  Strip Searches

Thomas complains that he was strip-searched four times between August 2 and August 9, 2010.  (Doc. 34-7 at 4.)  The claim is not directed at any particular Defendant.  He does not claim that any named Defendant subjected him to a strip search, or that any strip search was conducted in an improper manner. (Doc. 68-1 at 9.)

The Supreme Court has held that "correctional officials

---

[4] To the extent that Plaintiff raises other claims in this case that he also links to overcrowding, the court has considered those specific contentions as to each of the particular claims set out below.

must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." Florence v. Bd. of Chosen Freeholders of Burlington, 132 S. Ct. 1510, 1517 (2012). This rule gives consideration to the discretion prison officials need to do their jobs:

> The task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials . . . [and] in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters.

Id. (citations and internal quotations marks omitted).

In the present case, Defendant Porcher states in his affidavit that during this time period, August 4 to August 10, detention officers detected the smell of marijuana in Thomas' cell block. (Doc. 34 at 4.) He refers to incident reports which show that officers were searching for contraband during this time. (Doc. 34-3.) Besides failing to allege any misconduct by any of the named Defendants, Thomas provides no "substantial evidence" that any correctional official "exaggerated" his or her response to this legitimate security interest. The evidence thus indicates that the searches of Thomas were reasonably related to a legitimate, non-punitive governmental objective and did not violate Thomas' due process

rights.

### 5. Soap

Thomas complains that he was not given sufficient soap during his detention at ACDC. He claims that soap was passed out once per week, but he was given one-ounce packages rather than bars of soap. Thomas has not submitted any evidence to show that this caused the deprivation of a basic human need or resulted in any physical harm. See Williams, 952 F.2d at 824. He also has not shown, either directly or by inference, that any Defendant intended to punish him by limiting the amount of soap available to him. Martin, 849 F.2d at 870. Detainees, like inmates, "cannot expect the amenities, conveniences and services of a good hotel." Harris v. Fleming, 839 F.2d 1232, 1235 (7th Cir. 1988).

### 6. Failure to Conduct Medical Screenings

Thomas complains that detention officers failed to conduct medical screenings on incoming prisoners. In response, Defendants note that Thomas was given a medical screening on intake and that he may not raise claims on behalf of others. In his affidavit, Thomas clarifies this claim, stating that the failure to conduct proper medical screening led to him being subjected to the Licenator spray and being assaulted. (Doc. 68-1 at 11.) However, Thomas has not produced any evidence that

any Defendant failed to conduct medical screenings. Each Defendant testifies in his affidavit that when he was working as the booking officer, he always completed medical screenings on new, incoming inmates, and Thomas has produced no evidence to the contrary. Therefore, this claim will be dismissed.

### 7. Heat and Ventilation

Thomas alleges that it was too hot in the ACDC and that the ventilation was poor. In his affidavit, he states that "the crowd and poor sanitation causes the bad ventilation and the heat is a product of all the people in one spot. High officials are to blame for this." (Doc. 68-1 at 11.) However, Thomas has failed to connect his claim to any named Defendant. In addition, his grievance with respect to heat related to a period of time in January 2011 when Thomas complained that the heater was running too much, bringing the temperature up to eighty degrees by the afternoon, and in response to the grievance, maintenance personnel were called to address and monitor the heater. As to this claim, Thomas has not pointed to any evidence of deliberate indifference or that this condition of confinement caused a deprivation of a basic human need. See Williams, 952 F.2d at 824. Thomas also concedes that he failed to exhaust his administrative remedies on this claim (Doc. 15 at 19), in violation of 42 U.S.C. § 1997e(a). This claim will be

dismissed.

### 8. Inadequate Training

Thomas also alleges that the staff is inadequately trained and that this has caused him permanent problems. (Compl. at 9.) In his affidavit, he states that overcrowding has caused inadequate training and that it is the fault of "high officials." (Doc. 68-1 at 11.) Again, this is not an allegation against a named Defendant. Additionally, Thomas fails to produce any evidence that inadequate training has resulted in a violation of his due process rights. Therefore, this claim will be dismissed.

### 9. Face-to-Face Visitation

Thomas complains that pretrial detainees are not allowed face-to-face visits. In his affidavit, he states that electronic means of visiting are used at ACDC. (Doc. 68-1 at 11.) Defendant Porcher states by affidavit that pretrial detainees, just as any other inmate, are not allowed contact visits with family and friends to prevent contraband from entering the jail. (Doc. 34 at 7.) The visitations are accomplished by closed circuit television. Thomas has not produced any evidence that this method of conducting visitation violates his due process rights.

As the Fourth Circuit recently observed, "'the Constitution

does not require' pretrial detainees to be allowed 'contact visits,' when administrators have exercised their sound discretion in determining that such visits 'will jeopardize the security of the facility.'" Williams v. Ozmint, 716 F.3d 801, 807 (4th Cir. 2013) (quoting Block v. Rutherford, 468 U.S. 576, 589 (1984)). Therefore, failing to show a violation of any constitutional right, this claim will be dismissed.

### 10. Phone Privileges

Thomas makes no allegation in his complaint that he has actually been denied the use of a phone by any of the named Defendants, only that Defendant Porcher "acknowledges phones are turned off as a form of punishment." (Compl. at 9.) Thomas states in his affidavit that this has affected his "liberty and ability to contact witnesses before trial." (Doc. 68-1 at 11.)

Defendant Porcher states in his affidavit that the cell-block phones may be shut off for limited periods of time for security reasons or to restore order and discipline, but are then turned on. (Doc. 34 at 8.) The phones are usually available for use from 8:00 a.m. until 10:30 p.m. (Id.) Written communications, including those with attorneys, are not affected by this policy. (Id. at 9.)

There is no evidence of any intent to punish Thomas by limiting his telephone access, and the limitations were

19

reasonably related to legitimate governmental purposes. Under these circumstances, Thomas has not produced any evidence of a due process violation. See Washington v. Reno, 35 F.3d 1093, 1100 (6th Cir. 1994) ("Nevertheless, an inmate has no right to unlimited telephone use." (citation and quotation marks omitted)); Valdez v. Rosenbaum, 302 F.3d 1039, 1045-47 (9th Cir. 2002); Martin v. Tyson, 845 F.2d 1451, 1458 (7th Cir. 1988). Thomas also concedes that he failed to exhaust his administrative remedies on this claim (Doc. 15 at 19), in violation of 42 U.S.C. § 1997e(a). This claim will be dismissed.

### 11. Grievance System

Thomas complains generally about the "inadequate" grievance system due to the lack of responses to some of his grievances. (Compl. at 10.) He states in his affidavit that the system "could work if the jail was not overcrowded." (Doc. 68-1 at 12.) There is no constitutional right to a grievance process. Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) ("[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state."). There is also no evidence or contention that Defendants intended to punish Thomas by denying him access to the grievance system. Therefore, the fact that the grievance

system at ACDC may have been, in Thomas' view, "inadequate,"
does not state a constitutional violation.

### C. Defendants' Motions to Strike

#### 1. First Motion to Strike (Doc. 78)

Defendants have moved to strike certain portions of Thomas'
response to Defendants' motion for summary judgment.
Specifically, Defendants seek to strike those portions of
Thomas' responsive brief that are in excess of the thirty pages
of argument allowed by the court's prior briefing order. (Doc.
62.) Defendants later modified their request to exclude Thomas'
affidavit (Doc. 68-1 at 7-19) from their first motion to strike.
(Doc. 88 at 3.)

In response to his request, the court granted Thomas leave
to file a thirty-page response (an increase from the normal
twenty-page limit) to Defendants' motion for summary judgment.
Supporting exhibits were not included in this limitation.
Contrary to this order, Thomas filed approximately 530 pages of
material, with about 175 of those pages being handwritten
argument and 34 pages being heavily annotated exhibits. The
remaining 321 pages are exhibits without any handwritten
commentary or explanation.

Thomas' submission grossly exceeds the page limitation
allowed for his response brief. Even considering its content,

however, it is readily apparent that none of the excess argument would change any of the court's conclusions. Therefore, Defendants' motion to strike (Doc. 78) is denied as moot.

### 2.    Second Motion to Strike (Doc. 86)

In their second motion to strike, Defendants move to strike Thomas' surreply brief. (Doc. 82.) Surreplies are not allowed absent leave of court. See M.D.N.C. Local Rule 7.2; DiPaulo v. Potter, 733 F. Supp. 2d 666, 670 (M.D.N.C. 2010) ("Parties do not have the right to file a surreply."). As in DiPaulo, the court will not strike the surreply but also will not consider it for purposes of this summary judgment motion. As with the excess briefing addressed above, it is also apparent that, even if considered, the surreply would not change any of the conclusions set out above. Accordingly, Defendants' second motion to strike (Doc. 86) is also denied.

### D.    Thomas' Additional Motions

### 1.    Motion to Increase Page Limit (Doc. 92)

In his motion to increase page limit, Thomas asks for an increase in the number of pages allowed for him to respond to Defendants' motion for summary judgment. As pointed out above, Thomas has already greatly exceeded the allowed number of pages, and even if the additional pages are considered, those additional pages would not affect the court's conclusions set

out above.  To the extent that Thomas is seeking leave to file further, additional information, there is no need to allow it given the volume of information already filed.  The request is therefore denied.

### 2.    Motion for Extension of Discovery (Doc. 93)

Thomas seeks to extend the discovery period to gather information related to "population data and the assault."  (Doc. 93 at 1.)  However, he fails to show specifically how this information would be relevant to his claims.  His similar requests have been denied in the past, and this latest request is likewise denied.

### 3.    Motion for in Camera Review (Doc. 97)

Thomas seeks *in camera* review of Raymond Joiner's juvenile record.  Thomas' previous requests have been denied, and there is no reason to believe that the sealed juvenile record was either known to Defendants or relevant to the claims raised. Thus, the request is denied.

### E. Sealed Documents

Finally, Defendants previously filed certain of Thomas' medical records under seal.  Thomas subsequently filed his medical records as part of his response, without a request for sealing.  By Order dated September 2, 2014, the court gave the parties additional time to justify any continued sealing.

Thomas has since acknowledged that he waives his right to confidentiality. (Doc. 100.) Therefore, Defendants' exhibit labeled "Plaintiff's Inmate Medical Records" (Doc. 39) will be unsealed.

## III. CONCLUSION

IT IS THEREFORE ORDERED that Defendants' motion for summary judgment (Doc. 32) be GRANTED, that Defendants' motions to strike (Doc. 78, Doc. 86) be DENIED as moot, and that Thomas' motions (Doc. 92, 93, and 97) be DENIED.

IT IS FURTHER ORDERED that the Clerk is directed to unseal Defendants' Exhibit (Doc. 39) filed January 9, 2014.

/s/   Thomas D. Schroeder
United States District Judge

September 29 , 2014